IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE GILBERTO HERNANDEZ, ) <br> ) <br> Petitioner, ) <br> ) <br> vs. ) <br> ) <br> ) <br> D. K. SISTO, Warden, ) <br> ) <br> Respondent. ) <br> ) <br> _____ ) | No. C 09-00165 JW (PR) <br><br> ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY AS UNNECESSARY |

Petitioner, a California prisoner proceeding pro se, filed a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging a 2006 decision of the California Board of Parole Hearings ("Board") finding petitioner unsuitable for parole. The Court ordered respondent to show cause why the petition should not be granted. Respondent filed an answer, and petitioner filed a traverse.

**PROCEDURAL BACKGROUND**

According to the petition, in 1994, petitioner entered a plea of guilty and no contest in San Mateo County Superior Court to second degree murder and escape, respectively. The trial court sentenced petitioner to fifteen years to life plus three

years. On December 27, 2006, the Board denied petitioner eligibility for parole. Petitioner filed unsuccessful state habeas petitions in the California Superior Court, California Court of Appeal, and California Supreme Court. Petitioner filed the instant federal habeas petition on January 13, 2009.

## FACTUAL BACKGROUND

A.   <u>The Commitment Offense</u>

The following summary of facts is taken from the transcript of the Board hearing in which the Board read into the record the summary of the offense as found in petitioner's April 27, 2006 Board Report:

> On January 25, 1993, at approximately 6 p.m., San Mateo County police officers were dispatched to a residence on a report of a disturbance, possible suicide attempt by overdoes of pills. Upon arrival, officers observed a group of adults and children on the sidewalk in front of the residence. Several of the adults and children were crying and upset. The officers entered the residence and were told the victim, Gloria Carrasco, was in a bedroom. In one bedroom the officers located the body of the victim, partially suspended off the ground by a coaxial cable looped around her neck. The officers observed the coaxial cable attached to the hinge of the closet door, partially suspending the body of the victim from the floor. Rigor mortis had set into the body. In the bedroom, officers also observed the victim's six month old son Moses Hernandez in a bassinet. In the residence of the – the officers also located in the – the victim's four and a half year old daughter Teresa Vega. A note was located by officers lying near the body of the victim stating, "Jose, I love you. I'm sorry. Forgive me." The note was signed Gloria Carrasco. During the course of the investigation, officers discovered that the mother of the victim had received a phone call from her four and a half year old granddaughter Teresa at approximately 5:30 p.m. The granddaughter had advised her grandmother that her mother, the victim, would not wake up. When the grandmother arrived at the residence, she found the body of her daughter Gloria Carrasco. The victim was pronounced dead at the scene. An autopsy revealed the cause of death was asphyxia cause by ligature strangulation. The coroner's report ruled out suicide as the cause of death. San Mateo Police then spoke to Jose Gilbert Hernandez who stated he had been a long term boyfriend of the victim. Hernandez indicated the relationship had ended approximately three weeks prior to this event. Hernandez stated he had passed the victim's house at approximately 1:30 a.m. and observed a strange vehicle in the driveway. Hernandez then knocked on the door, which was answered by the victim. Hernandez then confronted a male subject who was in the victim's bed. Hernandez was ordered to leave and police were summoned. Officers arrived and directed Hernandez to leave the

residence. Hernandez returned later at approximately 7 a.m. to pick up his clothes. Officers then began to discover inconsistencies in Hernandez's statements. After officers Mirandized Hernandez, Hernandez reported that he returned to the victim's house at approximately 6:30 a.m. The man who had been at the residence earlier was gone. Hernandez requested that he and the victim get back together. The victim refused and told Hernandez to leave. Hernandez then stated that he saw a long black coaxial cable wire on the floor of the master bedroom. He decided to pick up the coaxial and murder the victim. Hernandez stated he then wrapped the cable around the victim's neck and strangled her for one to three minutes. The victim fell back unconscious. Hernandez then knelt on her back, picked up the cable and strangled the victim for an additional three minutes. When Hernandez realized that the victim was dead, he decided to make it look like a suicide. He picked up the coaxial cable, extended it over the top of the closet door and suspended the victim with the use of the cable. Hernandez said he then took a pen and wrote the note that the police found. Hernandez said he had left the two small children in the house, then locked the door of the victim's bedroom and left the residence. Hernandez stated he spent the day going to work and running errands. After work Hernandez went to the movies. When Hernandez was told that night that the victim had committed suicide, he pretended to be surprised. As a result of the continued investigation, Hernandez was subsequently arrested.

(Pet. Ex. G, Transcript ("Tr.") at 9-14.)

B.  Parole Suitability Hearing

Petitioner's minimum parole eligibility date was October 13, 2004. (Tr. at 1.) On December 27, 2006, petitioner appeared with counsel before the Board for a parole suitability hearing. The Board first heard from the petitioner regarding his state of mind at the time of the crime. (Tr. at 14-22.) The Board then summarized petitioner's criminal history, noting that he had no juvenile record and several adult arrests. (Tr. at 23-26.) The Board then reviewed petitioner's personal history, observing that he was born in Mexico City and has several step-siblings, and then moved to California when he was 10 years old. (Tr. at 29-30.) When petitioner was around 15 years old, he dropped out of school and began working. (Tr. at 36-37.) Petitioner had two sons with the victim. (Tr. at 34-35.) The Board then discussed petitioner's post-conviction factors. (Tr. at 41.) The Board noted that petitioner has been free from disciplinary and counseling chronos for approximately four years. (Tr. at 43.) Petitioner has completed several vocational courses. (Tr. at 43-45.) The

Board also praised petitioner for have exceptional work reports. (Tr. at 46.) The Board then acknowledged petitioner's efforts at self-help. (Tr. at 47-48.) The Board reviewed petitioner's 2006 psychological report which was favorable. (Tr. 51-52.) The Board then reviewed the factual summary for petitioner's second underlying offense, the escape, and also discussed petitioner's parole plans. (Tr. 53-66.) The District Attorney and counsel for petitioner asked questions of the petitioner, the Board heard closing statements from the District Attorney, counsel for petitioner, and petitioner. The Board then took a recess before rendering its decision finding petitioner unsuitable for parole. (Tr. at 90-100.)

## DISCUSSION

### A. Standard of Review

Because this case involves a federal habeas corpus challenge to a state parole eligibility decision, the applicable standard is contained in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). McQuillion v. Duncan, 306 F.3d 895, 901 (9th Cir. 2002). Under AEDPA, a district court may not grant habeas relief unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412 (2000). A federal court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1).

Where, as here, the highest state court to reach the merits issued a summary opinion which does not explain the rationale of its decision, federal court review under section 2254(d) is of the last state court opinion to reach the merits. Bains v. Cambra, 204 F.3d 964, 970-71, 973-78 (9th Cir. 2000). The standard of review under AEDPA is somewhat different where the state court gives no reasoned

1  explanation of its decision on a petitioner's federal claim and there is no reasoned
2  lower court decision on the claim. In such a case, a review of the record is the only
3  means of deciding whether the state court's decision was objectively reasonable. See
4  Plascencia v. Alameida, 467 F.3d 1190, 1197-98 (9th Cir. 2006). When confronted
5  with such a decision, a federal court should conduct "an independent review of the
6  record" to determine whether the state court's decision was an objectively
7  unreasonable application of clearly established federal law. Id. at 1198.

**B. Analysis of Legal Claims**

Petitioner claims that (1) the Board's decision violates due process because it was not support by some evidence and (2) the Board's decision denying petitioner parole violated due process because it breached his plea agreement. Respondent argues that California inmates do not have a federally protected liberty interest in parole release.

   1.   Some Evidence

The Ninth Circuit has held that California prisoners have a constitutionally protected liberty interest in release on parole, and therefore they cannot be denied a parole date without adequate procedural protections necessary to satisfy due process. See Irons v. Carey, 505 F.3d 846, 850 (9th Cir. 2007). The Supreme Court has clearly established that a parole board's decision deprives a prisoner of due process if the board's decision is not supported by "some evidence in the record," or is "otherwise arbitrary." Sass v. California Bd. of Prison Terms, 461 F.3d 1123, 1129 (9th Cir. 2006) (adopting "some evidence" standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)). The "some evidence" standard identified in Hill is clearly established federal law in the parole context for AEDPA purposes. Sass, 461 F.3d at 1128-29. Additionally, the evidence underlying the board's decision must have some indicia of reliability. McQuillion, 306 F.3d at 904; Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir. 1987). Accordingly, if the Board's determination of parole suitability is to

satisfy due process, there must be some evidence, with some indicia of reliability, to support the decision. Rosas v. Nielsen, 428 F.3d 1229, 1232 (9th Cir. 2005); McQuillion, 306 F.3d at 904.

Recently, the Ninth Circuit reheard en banc the panel decision in Hayward v. Marshall, 512 F.3d 536 (9th Cir. 2007), reh'g en banc granted, 527 F.3d 797 (9th Cir. 2008), which presented a state prisoner's due process habeas challenge to the denial of parole. The panel had concluded that the gravity of the commitment offense had no predictive value regarding the petitioner's suitability for parole and held that because the Governor's reversal of parole was not supported by some evidence, it resulted in a due process violation. 512 F.3d at 546-47. The Ninth Circuit has not yet issued an en banc decision in Hayward. Unless or until the en banc court rules otherwise, the holdings in Biggs v. Terhune, 334 F.3d 910, 916 (9th Cir. 2003), Sass, and Irons are still the law in this circuit.

When assessing whether a state parole board's suitability determination was supported by "some evidence," the court's analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state. Irons, 505 F.3d at 850. Accordingly, in California, the court must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record in order to determine whether the state court decision constituted an unreasonable application of the "some evidence" principle. Id.

California law provides that a parole date is to be granted unless it is determined "that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration . . . ." Cal. Penal Code § 3041(b). The California Code of Regulations sets out the factors showing suitability or unsuitability for parole that the Board is required to

consider. See 15 Cal. Code Regs. tit. 15 § 2402(b). These include "[a]ll relevant, reliable information available," such as:

> . . . the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in finding of unsuitability.
> Id.

Circumstances tending to show unsuitability for parole include the nature of the commitment offense and whether "[t]he prisoner committed the offense in an especially heinous, atrocious or cruel manner." Id. at § 2402(c). This includes consideration of whether "[t]he offense was carried out in a dispassionate and calculated manner," whether the victim was "abused, defiled or mutilated during or after the offense," whether "[t]he offense was carried out in a manner which demonstrated an exceptionally callous disregard for human suffering," and whether "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." Id. Other circumstances tending to show unsuitability for parole are a previous record of violence, an unstable social history, previous sadistic sexual offenses, a history of severe mental health problems related to the offense, and serious misconduct in prison or jail. Id.

Conversely, circumstances tending to support a finding of suitability for parole include: no juvenile record; a stable social history; signs of remorse; that the crime was committed as a result of significant stress in the prisoner's life; a lack of criminal history; a reduced possibility of recidivism due to the prisoner's present age; that the prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release; and that the prisoner's

1  institutional activities indicate an enhanced ability to function within the law upon
2  release. See id. at § 2402(d).
3        In making its determination in this case, the Board analyzed numerous facts
4  weighing for and against suitability for parole.  The Board began by reviewing the
5  commitment offense and determined that it was carried out in an especially cruel and
6  callous manner.  (Tr. at 90-92.)  The Board commented that it was an "absolutely
7  appalling offense."  (Tr. at 90.)  The Board also found that there were multiple
8  victims, including the two young children that petitioner left alone in the house after
9  he murdered their mother.  (Tr. at 91-92.)  Further, the Board felt that, based on
10 petitioner's "canned" sounding responses, petitioner knew what he was doing when
11 he went to the victim's house the morning of the crime.  (Tr. at 92.)  The Board
12 continued to conclude that the victim was "abused, defiled, and mutilated," and the
13 motive for the murder was pure jealousy.  (Tr. at 92.)  The Board expressed concern
14 that petitioner's responses seemed insincere and evasive.  While commending
15 petitioner on his many achievements while incarcerated, the Board stated, "My
16 concern with you, sir, of course is that programming is stopped at the neck and
17 hasn't gone down to the heart or to the gut."  (Tr. at 94.)  The Board concluded that
18 the factors tending to show suitability were outweighed by factors showing
19 unsuitability and denied parole.
20       This court also concludes that the Board reasonably found that the
21 circumstances of the offense was carried out in an especially cruel and callous
22 manner that demonstrated an exceptionally callous disregard for human suffering.
23 The victim was the mother of petitioner's children.  Petitioner strangled her with a
24 coaxial cord until she fell unconscious, repositioned her body to continue the
25 strangulation to ensure death, and then repositioned her body again in an attempt to
26 make it look as if she had committed suicide.  After petitioner killed the victim, he
27 knowingly left a baby and a four year old alone in the house without any adult
28 supervision and with their deceased mother.  These harsh facts of the commitment

1   offense alone amount to "some evidence" supporting the Board's denial of parole
2   eligibility.  Still, there was additional evidence in the record, i.e., the Board's
3   perception of petitioner's insincere and evasive responses, supporting the Board's
4   parole denial as well.  Thus, the record of the 2006 parole hearing demonstrate  at
5   least "some evidence" that petitioner would pose a risk of harm to society if released
6   and that parole should be denied.  See Rosas, 428 F.3d at 1232–33 (facts of the
7   offense and psychiatric reports about the would-be parolee sufficient to support
8   denial).
9         The state court's rejection of petitioner's due process claim was neither
10  contrary to nor an unreasonable application of the "some evidence" requirement of
11  due process.  Moreover, this was only petitioner's second parole hearing and at that
12  time, petitioner had only served approximately fourteen years of his eighteen years
13  to life sentence.  Based on this record, petitioner cannot demonstrate a due process
14  violation at this time.  Cf. Irons v. Carey, 505 F.3d 846, 853-54 (9th Cir. 2007)
15  (noting that Ninth Circuit has upheld denial of parole based solely on commitment
16  offense and/or pre-commitment conduct where prisoners have not yet served
17  minimum number of years required by their sentence); Biggs, 334 F.3d at 912
18  (same).  Therefore, the state court's rejection of petitioner's due process claim was
19  not contrary to or an unreasonable application of the "some evidence" standard.
20      2.    <u>Breach of plea agreement</u>
21        Petitioner claims that when he entered his guilty plea, he did so upon the
22  promise of trial counsel that he would be released in approximately eleven years.
23  Thus, argues petitioner, the Board's denial of parole suitability after having been
24  incarcerated for fourteen years breached his plea agreement and denied petitioner his
25  right to due process.  Respondent does not address this contention.
26        "[W]hen a plea rests in any significant degree on a promise or agreement of
27  the prosecutor, so that it can be said to be a part of the inducement or consideration,
28  such promise must be fulfilled." Santobello v. New York, 404 U.S. 257, 262 (1971).

1  Plea agreements are contractual in nature and subject to contract law standards of
2  interpretation.  In re Ellis, 356 F.3d 1198, 1209 (9th Cir. 2004).  If the terms of the
3  plea agreement have a clear and unambiguous meaning, then the court does not look
4  to extrinsic evidence.  United States v. Streich, 560 F.3d 926, 929-30 (9th Cir.
5  2009).

6  Here, petitioner's signed plea agreement for the second degree murder
7  conviction states, "My attorney has explained that the maximum penalty, including
8  penalty assessments, which could be imposed as a result of my plea(s) of guilty or
9  nolo contendere is fifteen (15) years to life in prison . . ."  (Pet. Ex. 2.)  This
10 agreement is signed by the petitioner.  Further, at petitioner plea colloquy, the trial
11 court inquired, "Did you read, understand and sign each of [the waiver of rights and
12 plea] forms?"  (Pet. Ex. 1.)  The petitioner answered that he did.  Then the court
13 stated, "On the murder charge, the maximum penalty while could be imposed is an
14 indeterminate sentence of 15 years to life in prison, to be followed by a period of
15 parole, which could be as long as life. . . . Do you understand all that?"  (Id.)
16 Petitioner again answered in the affirmative.  (Id.)  Finally, the court asked, "Has
17 anything different than that been said to you to get you to enter this plea?"  (Id.)
18 And petitioner answered, "No, your Honor."  (Id.)  Looking to the plain terms of the
19 written plea agreement as well as the plea colloquy, it is clear that the parties
20 understood petitioner was facing a maximum prison term of 15 years to life on the
21 second degree murder charge and 3 years on the escape charge.  Petitioner's
22 contention to the contrary is belied by the record.  There is no evidence that
23 expectations about how parole would be decided were part of the plea agreement.

24 The possibility of parole does not mean a guarantee of parole; under state law
25 (as it existed when he was sentenced and as it exists now), the inmate must be found
26 suitable before his term and release date are set.  Petitioner received the parole
27 considerations to which he was entitled under his agreement and sentence.  In
28 Brown v. Poole, Brown was able to point to explicit statements in the plea colloquy

that led her to believe she would get out in half the minimum years if she behaved herself in prison. See Brown, 337 F.3d 1155, 1159-60 (9th Cir. 2003) ("Brown heard and acknowledged the prosecutor's promises, and in the process of waiving her right to trial she accepted them as part of her bargain. 'The intent of the parties becomes clear upon an examination of the language of the plea agreement and the conduct of the parties during the plea colloquy.'") Unlike the Brown petitioner, this petitioner cannot identify any actual promise made to him or any particular term of the agreement that has been breached.

Moreover, the trial court held a hearing on petitioner's motion to withdraw his guilty plea on the ground that petitioner's plea was involuntary. (Pet. Ex. 6.) Specifically, petitioner's argument was that he believed he was only going to be incarcerated for eleven years based on trial counsel's promises. The trial court denied petitioner's motion, finding petitioner's assertions not credible and concluded that petitioner did not meet his burden of proof to sustain his argument. (Id. at 77-78.)

Accordingly, the state court's rejection of the breach of plea agreement claim was not contrary to, or an unreasonable application of, clearly established Supreme Court authority.

## CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners have recently been amended to require a district court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in its ruling. See Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (effective December 1, 2009). However, the Ninth Circuit has made clear that a state prisoner challenging the Board of Prison Terms' administrative decision to deny a request for parole need not obtain a certificate of appealability. See Rosas, 428 F.3d at 1232. Accordingly, any request for a COA is DENIED as unnecessary.

**CONCLUSION**

For the foregoing reasons, the petition for a writ of habeas corpus and a COA are DENIED.

DATED: April 16, 2010

JAMES WARE
United States District Judge

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE GILBERTO HERNANDEZ,<br><br>            Petitioner,<br><br>   v.<br><br>D. K. SISTO, Warden,<br><br>            Respondent.                                   / | Case Number: CV09-00165 JW<br><br>**CERTIFICATE OF SERVICE** |

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on     4/16/2010     , I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Jose Gilberto Hernandez J-12875
California State Prison - Solano
2100 Peabody Road
P. O. Box 4000
Vacaville, Ca 95696-4000

Dated:     4/16/2010

                                        Richard W. Wieking, Clerk
                                   /s/ By: Elizabeth Garcia, Deputy Clerk

Jose Gilberto Hernandez J-12875
California State Prison - Solano
2100 Peabody Road
P. O. Box 4000
Vacaville, Ca 95696-4000


CV09-00165 JW